## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| OSGHD, LLC, | § | |
| | § | |
| Plaintiff, | § | Case No. _____ |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| NOMI HEALTH, INC., and | § | |
| DOMO, INC., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff OSGHD, LLC hereby brings this Original Complaint against Defendants Nomi Health, Inc., and Domo, Inc., and respectfully shows this Honorable Court as follows.

## NATURE OF THE ACTION

1.      This action arises under the Copyright Act, and other laws, for Nomi's and Domo's willful infringement of OSGHD's copyrighted software application and other actionable wrongdoing.[1]

2.      This case concerns three companies and a global pandemic that changed everything. The first company, OSGHD, licensed to the second company, Nomi, a software-as-a-service application (the "Application").[2] OSGHD is a sophisticated software-development company, and Nomi is a COVID-19 testing company. The Application provided Nomi a custom-

---

[1] This action also sounds in trade-secret misappropriation. Because OSGHD, under applicable misappropriation law, must undertake reasonable measures to protect the secrecy of OSGHD's proprietary information, OSGHD describes herein its trade secrets at a broad level of generality and will disclose its trade secrets in greater detail upon entry of a protective order.

[2] OSGHD licenses from OnSite Health Diagnostics, LLC a base application called the Event Management System. OSGHD modified the Event Management System to create the COVID-19 testing application at issue here. OSGHD owns the entirety of the modified base application, which OSGHD refers to simply as the "Application."

1

tailored platform for data collection, reporting, result aggregation, reporting, and scheduling for Nomi's COVID-19 testing centers. During the tumult of the COVID-19 pandemic, Nomi's services proved profoundly lucrative. As the pandemic raged and Nomi found its services in peak demand, however, Nomi grew dissatisfied with the need to share the fruits with OSGHD. So Nomi hatched a scheme to purloin OSGHD's intellectual property and to kick OSGHD to the curb. The third company, Domo, helped Nomi pull off the scheme. Domo, like OSGHD, is a software-development company. Nomi (unlawfully) provided Domo the Application and instructed Domo to copy the Application; Domo did so, creating duplicate software for Nomi. The copycat software is known as "Project Tiger" and, on information and belief, is also known as Nomi's "Testing App," "Project Purge," and/or "Big Cat."[3] Nomi and Domo then collectively hosted Project Tiger on servers, and Nomi continued conducting COVID-19 testing, this time with Project Tiger.

3.      Nomi with Domo's help unjustly earned hundreds of millions of dollars in COVID-19 testing monies—earnings that OSGHD is entitled to recover as disgorgement remedies under federal law.

**PARTIES**

4.      Plaintiff OSGHD, LLC is a Texas limited-liability company with its principal place of business in Dallas County, Texas. OSGHD consists of a single member, Anthony Gibson, who resides in Dallas.

5.      Defendant Nomi Health, Inc. is a Delaware corporation with its principal place of business in Orem, Utah. Nomi may be served with citation through its registered agent for service of process in Texas: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

---

[3] For simplicity, OSGHD refers to the copycat software as "Project Purge."

6.      Defendant Domo, Inc. is a Delaware corporation with its principal place of business in American Fork, Utah. Domo may be served with citation through its registered agent for service of process in Utah: Corporation Service Company, 772 E. Utah Valley Drive, American Fork, Utah 84003.

## JURISDICTION & VENUE

7.      This Court has jurisdiction over OSGHD's claims under the Copyright Act and the Defend Trade Secrets Act ("DTSA") because those claims arise under the laws of the United States. *See* 28 U.S.C. § 1331; *see also* 17 U.S.C. § 501; 18 U.S.C. § 1836. This Court has jurisdiction over OSGHD's state-law claims for fraudulent inducement, string-a-long fraud, and tortious interference with contract because those claims are so related to the claims arising under the Copyright Act and the DTSA that they form part of the same case or controversy. *See* 28 U.S.C. § 1367.

8.      This Court has jurisdiction over all of OSGHD's claims under 28 U.S.C. § 1332. The parties are of completely diverse citizenship. OSGHD is a citizen of Texas because it is a limited-liability company whose sole member, Mr. Gibson, is a resident of Texas and because OSGHD maintains its principal place of business in Texas. Nomi and Domo are citizens of Delaware and Utah because they are incorporated under the laws of Delaware and maintain their principal places of business in Utah. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.      This Court has specific–personal jurisdiction over Nomi and Domo.

10.     Nomi and Domo infringed OSGHD's copyrights (directly and/or indirectly), caused and/or materially contributed to such infringement, and/or misappropriated OSGHD's trade secrets in this District vis-à-vis a COVID-19 testing partnership between Nomi and Dallas

County. For the same reason, this Court is the proper venue. Nomi and Domo would be subject to personal jurisdiction in this District were it a separate state. And a substantial part of the events or omissions giving rise to the claims occurred in this District. *See* 28 U.S.C. § 1391.

11. Nomi and Domo also hatched their scheme to infringe OSGHD's intellectual property in this State. On February 4, 2022, Domo's Ryan Olaveson granted access to a prototype version of Project Tiger to Nomi's Jason Cook, Fred Harder, Tyler Crump, Hardik Shah, and Collin Holland. On information and belief, Mr. Harder resides and works from (now and at the time of the wrongdoing) in this District.

12. Insofar as the Court has personal jurisdiction and venue over at least one claim for each of Nomi and Domo, the Court may exercise pendent–personal jurisdiction and pendent venue over the remaining claims.

## STATEMENT OF FACTS

### A. BACKGROUND

13. OSGHD is a software developer that licensed its software application (the "Application") to a company named Nomi Health, Inc. ("Nomi"). The Application serves as a centralized platform for data management, reporting, and scheduling for testing and vaccination centers in response to the COVID-19 pandemic. The Application provides a solution for point-of-care access that integrates staffing, logistics, and customer service while ensuring patients' personal healthcare information is handled in compliance with all relevant laws governing such data. The Application is used only on web servers that are hosted and controlled by OSGHD.

14. Nomi was founded in 2019 as a healthcare company. When the COVID-19 pandemic hit in March 2020, Nomi focused its efforts on providing COVID-19 testing. Nomi quickly ramped up to provide COVID-19 testing and vaccinations at hundreds of locations throughout the United States, including many in Texas. Nomi's website discusses the millions of

COVID-19 tests that it has performed and states that "we tested more patients daily than all the big box pharmacies combined."

15.     While the global pandemic was a calamity for the world, it was a financial windfall for Nomi and its executives. It has been reported that Nomi made hundreds of millions of dollars in revenues from its COVID-19 testing and vaccinations, and OSGHD believes Nomi's revenues from its COVID-19 testing and vaccinations for an approximately two-year period exceed ***one billion dollars***.

16.     Nomi's business practices have been the subject of investigative reports, including an expose by *USA Today*, which have raised serious questions regarding the company's business ethics. For example, the *USA Today* article discusses how Nomi was able to profit off the pandemic through a network of political connections and "no-bid" contracts that resulted in taxpayers from four different states paying Nomi more than $200 million in return for questionable test results. As further reported, Nomi recently leveraged the enormous revenues it generated from COVID-19 testing to raise an additional $110 million from venture capital firms and purchase three additional healthcare companies.

17.     The Application was central to Nomi's ability to do business; in fact, it was indispensable. Beyond OSGHD, there were few, if any, companies who were able to provide the complex and scalable software that was necessary for Nomi to provide its COVID-19 testing in the short timeframe it was required. But for OSGHD, Nomi would have been unable to earn the hundreds of millions of dollars in revenues that it achieved.  Nomi used the Application to perform millions of COVID-19 tests and, on information and belief, made hundreds of millions of dollars in profits from those testing operations.

### B.   OSGHD LICENSES THE APPLICATION TO NOMI

18.   From September 2020 to May 2022, Nomi licensed the Application from OSGHD to streamline staffing administration and point-of-care logistics for Nomi's testing and vaccination centers. The parties' relationship was governed by the terms of a license agreement, which was subsequently modified.[4]

19.   The License Agreement allowed Nomi to use OSGHD's Application, which OSGHD would further tailor to Nomi's bespoke business needs, for payment of an agreed-upon fee. All such use of the Application by Nomi was subject to certain terms and conditions of use, as articulated in the License Agreement. Relevant here, Section 2.9 of the License Agreement prohibited Nomi (as Licensee) from certain actions with respect to the Application:

> **2.9 Restrictions**
>
> Without a separate written agreement with Licensor to the contrary, Licensee must not do, or permit others to do, any of the following: (a) attempt to view, read, modify, reverse compile, reverse assemble, disassemble, or print the Application's source code or object code or other runtime objects or files distributed with the Application; (b) otherwise reverse engineer, modify, or copy the look and feel, functionality, or user interface of any portion of the Application (for the avoidance of doubt, this does not prevent Licensee from developing any functionality whatsoever provided it is done without reference to or aid of access to the Application); (c) rent, lease, distribute (or redistribute), provide, or otherwise make available the Application, in any form, to any third party; (d) share Online Account or Online Account Access Information with third parties; (e) violate or attempt to violate the security of Licensor's networks or servers, including (i) access data not intended for Licensee or log into a server or account which Licensee is not authorized to access; (ii) attempt to probe, scan, or test the vulnerability of a system or network or to breach security or authentication measures without proper written request and authorization; or (iii) attempt to interfere with service to any user, host, or network, including by means of submitting a virus, overloading, flooding, spamming, mail bombing, or crashing.

Critically, Nomi "must not" (and may not "permit others to") do any of the following: (i) "reverse engineer, modify, copy the look and feel, functionality or user interface of any portion of the

---

[4] Most of the agreement was substantively identical as between 2020 and 2021. Because the 2021 License Agreement was operative at the time of the events that gave rise to this action, OSGHD uses "License Agreement" interchangeably with "2021 License Agreement."

Application"; (ii) "distribute (or redistribute), provide or otherwise make available the Application in any form to any third party"; and/or (iii) "share Online Account or Online Account Access Information with third parties."

20.     The above protections are vital because parties to whom OSGHD licenses the Application have access to OSGHD's copyrighted materials and trade secrets. To provide an extra measure of security, OSHGD subjected Nomi to strict confidentiality and nondisclosure obligations. Under Section 7.2, Nomi must maintain the Application's confidence and may permit its employees to access the Application only if necessary in the ordinary course of their employments:

> **7.2 Nondisclosure**
>
> Except as otherwise provided in this Agreement, each party agrees that it will not use or disclose to any third party any Confidential Information of the other party for any reason, except to its employees, who require such knowledge in the ordinary course of their employment and are held to the same confidentiality obligations set forth in the Agreement. Each party will take all necessary action to ensure that its employees comply with the confidentiality provisions of Section 7.

To avoid doubt, Nomi confirmed that the Application and underlying software were "Confidential Information" under the Agreement:

> **7.1 Defined**
>
> As used in this Section 7, "Confidentiality Obligations" means and includes the Application, terms of this Agreement, and any other information regarding either party's business, operations, or activities that is clearly marked with a confidential, private, or proprietary legend or reasonably understood to be confidential based on the circumstances and nature of the disclosure. Licensee understands that the Application and underlying software comprise confidential information and know-how that are the exclusive property of Licensor and its licensor(s), if applicable.

21.     Nomi's confidentiality and nondisclosure obligations survived the Agreement's termination.

### C.   NOMI INFRINGES AND MISAPPROPRIATES OSGHD'S INTELLECTUAL PROPERTY

22.     As noted above, OSGHD discovered Nomi was using portions of the Application as a template to develop an alternative application. Specifically, on March 18, 2022, OSGHD employee Nathan Redding accessed Nomi's workflow/collaboration platforms called JIRA and Confluence and discovered direct and irrefutable evidence of Nomi's scheme to create a platform internal to Nomi based upon the Application. In fact, two weeks later Nomi "went live" with the Tiger platform that it had secretly been developing by reverse engineering, modifying, and copying OSGHD's Application.

23.     Nomi personnel, who themselves should not have accessed the Application, were discussing Application components with similarly unauthorized Domo personnel. Nomi, for example, captured at least dozens of screenshots and screencasts of the Application and circulated them to Nomi's internal developers, as well as Domo's developers, when crafting Project Tiger's requirements specifications.

24.     The end of result of Nomi's collaboration with Domo was predictable: Project Tiger's primary functions and applications are virtually indistinguishable from those of the Application. At a high level, Project Tiger's basic architecture includes components called "Registration," "Site Staff App," and "Call Center / Admin App." With respect to both structure and functionality, each of these corresponds to the Application's Registration, Tablet, and Admin Components, respectively. Nomi used unauthorized screenshots and screencasts of the Application to communicate its application preferences to Domo, which copied many Application components into Project Tiger. Project Tiger was based upon improper Application access. Unsurprisingly, therefore, Project Tiger training videos reveal a user experience nearly identical to the Application—but adorned with Domo's logo, rather than OSGHD's. *Id.*

25.    Start with side-by-side comparisons. Here are two side-by-side comparisons of the

Registration Components:

| OSGHD Application | Nomi Project Tiger Application |
|---|---|



| OSGHD Application | Nomi Project Tiger Application |
|---|---|




26.    Here is a side-by-side comparison of the Site-Staff and Tablet Components:

OSGHD Application                     Nomi Project Tiger Application



27.     The analysis of the interfaces reveals similarities in the features, functionality, fields, layout, text, and requirements that are the result of Nomi's misappropriation.

28.     Project Tiger also contains a number of design quirks, further evidencing the misappropriation. Often when software is copied, certain aspects of the software being copied make their way into the copied software. These aspects on occasion make little logical sense in the context of the new application but find their way into an application because little to no thought was put behind the user experience. These design quirks can sometimes be a significant "tell" that a piece of software was copied. At least six such quirks can be observed within Project Tiger.

29.     First, user authentication by birthdate. Within the Patient Registration form of Project Tiger, users are asked to "Confirm your birthday" after already having to enter their birthdates an initial time. This feature exists primarily within the Application because users log back into the software to get their results via a passwordless mechanism that requires patients to enter their birthdates. Therefore, the date of birth acts as a password of sorts, which, if entered

10

incorrectly, would render patients unable to get their result. As such, requiring patients to double-enter their birthdates provides an extra verification that patients typed their birthdates correctly. In Project Tiger, however, patients log into their accounts via a password and therefore the need to confirm birthdates is not necessary.

30.     Second, infectious-disease testing. Within the Patient Results Dashboard of Project Tiger, there is a sub-heading labeled "Infectious Disease Testing." This heading was added by Mr. Redding toward the end of the engagement with Nomi as a way to distinguish testing type results such as Flu, COVID, and Strep from other types of results shown to the patients on their dashboards such as health fair results. "Infectious Disease Testing" is a term that Mr. Redding came up with to group such testing results. Mr. Redding had never heard Nomi use that wording as a classification of such tests. Moreover, at launch, Project Tiger was not believed to have a need to distinguish infectious-disease testing from other results as Nomi did not support other non–infectious disease testing at the time.

31.     Third, searchable columns. With the Admin Component of Project Tiger, there are data tables that closely resemble tables found within the Application. These tables are the primary means to search for Patients and Results. These tables have a column header where a keyword can be entered into the column header to filter results of the table to matching values. While not completely unprecedented, such a mechanism to search for something such as a patient or result is among the rarer user-interface mechanisms. Typically an application might have a single search field or a separate form allowing for more advanced search rather than building it directly into the table. Yet, Project Tiger specified such search column headers in the requirements and ended up with the same searching mechanism as the Application. Moreover, Project Tiger generally appears to have the same columns as the Application in the same order in such tables.

32.     Fourth, patient selection. Within the Patient data/search table in the Admin Component of Project Tiger, a user selects patients to get more detail by clicking on the e-mail addresses, which are contained in the last column of the table. This was always a weird quirk of the Application that Mr. Redding considered changing on multiple occasions. He had no rhyme or reason to base patient selection on e-mail addresses. More natural, for example, would have been clicking anywhere in the row or the user's name, a separate icon, etc. But for no clear reason, the Application had the user select patients via the last column, their e-mail addresses. This same mechanism of selecting the e-mail address to drill further into patient details is identical in Project Tiger.

33.     Fifth, random statistics. Within the Site Staff application of Project Tiger, the testing event dashboard shows four statistical boxes: Assigned Timeslots, Check-Ins, Completed, and Average Duration. These four statistics come from the basic (unmodified) software package from OnSite. OnSite's business model, which operates at a far lower screenings per event than Nomi, relied more on a fixed list of patients and greatly benefitted from the ability for OnSite to optimize staffing levels and to streamline its testing processes. These four statistics were key to its ability to do so. Nomi, however, showed no particular interest in these particular statistics. Yet Project Tiger recreated the same four statistics word for word.

34.     Sixth, flow rate. Also within the Project Tiger design mockups, the mockup for Nomi's Site Staff Application event dashboard screen displays a Flow Rate Model and Flow Rate. These are also features from the basic (unmodified) software package from OnSite and appear in the Application on the same event dashboard screen. These features are again specific to OnSite's staffing models and were never used by Nomi. They were in fact little understood by Nomi. (Indeed, they were little understood by most OSGHD employees, including Mr. Redding.) Yet,

the mockup shows these features referenced, which indicates that the Project Tiger mockups were copied from that of the Application.

**D.    OSGHD SEEKS RELIEF**

35.    Upon discovering Nomi's and Domo's infringement and misappropriation, OSGHD immediately consulted legal counsel. Through counsel, OSGHD on April 8, 2022 sent Nomi a cease-and-desist letter.

36.    Nomi responded three days letter with a letter that accused OSGHD of "price gauging" [*sic*] and denied any wrongdoing on Nomi's part. Indeed, despite a paper trail of evidence revealing Nomi's conspiracy with Domo to "copy and paste" portions of the Application into Project Tiger, Nomi rejected any notion that it had acted improperly. Not only did Nomi deny any wrongdoing, Nomi stated its desire to terminate the License Agreement "for NOMI's Convenience."

37.    Left out in the cold and with its most valuable intellectual property hijacked by Nomi and Domo vis-à-vis Project Tiger, OSGHD sued Nomi the following week in the 14th Judicial District in Dallas County, Texas for breach of contract. OSGHD now sues in this Court to vindicate its rights arising under federal law.

<u>**FIRST CLAIM: DIRECT COPYRIGHT INFRINGEMENT**</u>

***Nomi and Domo are liable for direct copyright infringement under 17 U.S.C. § 501.***

38.    OSGHD incorporates by reference the prior paragraphs as though fully set forth herein.

39.    OSGHD owns valid copyrights. OSGHD is the sole owner of the Application as provided to Nomi under the License Agreement, including the underlying source code and object code, and all outputs arising from that code, including nonliteral elements such as the code's structure, sequence, organization, information architecture, graphical displays, user interfaces, and

all copyrightable subcomponents thereof. OSGHD has sixty registered copyrights in the Application (collectively, "the Copyrighted Work"). *See* Ex. A.

40.    As explained, OSGHD licenses a basic (unmodified) software package from OnSite. This unmodified software offering was the Application's "code base." To create the Application, OSGHD (with OnSite's permission) took the unmodified software's code base, forked it, and modified it to meet resiliency, performance, information-security, regulatory, and bespoke–customer requirements related to COVID-19 testing and vaccination. The end result was the Application, an original software application that is unique and commercially valuable.

41.    OSGHD's copyrights correspond to three categories of original art within the Application: (1) copyrights related to the look and feel of the Application's dynamic registration functionalities (the "Registration Copyrights"); (2) copyrights related to the look and feel of the Application's tablet interface/functionalities (the "Tablet Copyrights"); and (3) copyrights related to the look and feel of the Application's admin portal and administrative settings (the "Admin Copyrights").

42.    In the world of software-application development, nuanced, seemingly minor differences in an application's layout and user interface (often called the application's "look and feel") have ripple effects that frame the way a user experiences the application and engages with content in the application. Understood from a front-facing perspective, these differences manifest in the unique combination of page layout, color combinations, font types/sizes, call-out options, and overall format of a given application or a subcomponent thereof. On the back end, countless permutations of inputs and outputs are designed to create a "flow" between different pages or subcomponents within the user interface.

43.     OSGHD and other software-development companies spend millions of dollars researching the best, unique combinations of these front-end and back-end interfaces to create applications that increase levels of user engagement, retention, and spend. For OSGHD, such investments paid off in the Application and the attendant Copyrighted Work.

44.     For each Copyright, OSGHD identified the code that renders the page to the screen (the "views") and the code that provides data to those views and controls the behavior of user interactions with that screen (the "controllers") along with any other related code. Together, these views and controllers determine what components and data appear on the screen, their layout, the interactions the user can have with the screen, and the navigation of the user between screens. More generally, these views and controllers are OSGHD's original works that determine the Application's "user experience." Put differently, the "user experience" is the creative expression realized by the original work, with different user experiences corresponding to different functionalities within the Application.

45.     The source code comprising the above-referenced views and controllers was submitted for copyrighting as a combination of Ruby, JavaScript, and HTML (in the form of Embedded Ruby templates). To reach a final combination of views + controllers that tells a cohesive narrative for the user of an application and streamlines the user's experience is no small task for developers like OSGHD. Indeed, OSGHD's sixty copyrights constitute a unique, proprietary combination of views and controllers. Because the view and controllers for one interface are implicated by the views and controllers for adjacent interfaces, should *any one of those subparts change*, the Application would be fundamentally altered.

46.     As noted, the Copyrighted Work constitutes wholly original material. By registering its Copyrighted Work with the United States Copyright Office, OSGHD took the

necessary steps to ensure that the fruits of its labors vis-à-vis the Application receive robust legal protections.[5] Yet Nomi, aided and abetted by Domo, co-opted OSGHD's labors by copying Nomi's original work without permission to craft its own application—circumnavigating the need to pay OSGHD's fees and enjoying the head start of OSGHD's ingenuity while avoiding the labor and expenses necessary to create such a sophisticated software application.

47.     Nomi and Domo factually copied the Copyrighted Work.

48.     Nomi "owns" Project Tiger and uses the software in the marketplace, and Nomi and Domo jointly host the software on servers. As Nomi admits in sworn testimony given in the state-court litigation, the "Tiger platform is hosted by NOMI and DOMO." That fact is confirmed by Domo's own correspondence. As Domo's Mr. Olaveson wrote to Nomi's Ms. Buldo and others, "The solution [Project Tiger] will be hosted in a single Domo instance and will include . . . an on-site testing app use by nurses to walk patients through the testing flow and administer the test."

49.     Nomi provided both still images and recordings of the Copyrighted Work to developers of Project Tiger, including Domo. Nomi and Domo used the Copyrighted Work in Project Tiger. The "screenshot" images served to capture the overall page layout and information layout, i.e., the "information architecture" of the Application, and the recordings served to capture the possible user interactions with the Application's screens, i.e., the "user experience."

50.     The information architecture relates to the non-literal aspects of the Copyrighted Work, including the structure of the Application, sequence and organization of the Application, and the Application's user interface, screen displays, and menu structures—all of which are protected under the Copyright Act. Project Tiger, accordingly, resulted in a "user experience"

---

[5] Keeping with best practice to protect its trade secrets, OSGHD filed with the Copyright Office redacted versions of the code.

substantially similar to that of the Application, with substantially similar user input and output interface formats. Nomi, through Project Tiger, thus copies and appropriates the Copyrighted Work. The user experience is evident in the information architecture, menu structures, and screen displays associated with the Application, arising from the underlying code, which are protectable under the Copyright Act and, as noted above, contain subject matter that is original creative content.

51.     Project Tiger is substantially similar to the Copyrighted Work. To take just one example, consider the copyright registration "Tablet – Event Home." In the side-by-side comparison below, OSGHD's Copyrighted Work appears on the left. In the comparison, the corresponding screen of Project Tiger appears in the upper-right, and a Project Tiger design mockup of the same screen appears in the bottom-right:[6]



---

[6] The multi-colored boxes on each image and text in the bottom-right corner are not part of the application screens themselves but were added by counsel after the fact for purposes of comparison.

17

52.     As reflected in the above, Nomi and Domo altered the inconsequential aspects of the look and feel—colors, fonts, etc.—while leaving the more consequential aspects intact—the general layout of the screen and the overall experience of the user.

## SECOND CLAIM: CONTRIBUTORY COPYRIGHT INFRINGEMENT

### *Domo is liable for contributory copyright infringement under 17 U.S.C. § 501*.

53.     OSGHD incorporates by reference the prior paragraphs as though fully set forth herein.

54.     Domo had knowledge of Nomi's infringement or reason to know of that infringement.

55.     Nomi tasked Domo with developing Project Tiger's Registration and Site Staff Components, copied from the Application's  Registration and Tablet Components, the two components critical to implementing a COVID-19 testing solution. In so tasking Domo, Nomi provided Domo with at least dozens of screen captures and recordings of the Application to use as a basis to copy the Application. These screen captures and recordings were transmitted in form or substance through Jira, Confluence, and Figma, or extracts therefrom, and provide, in great detail, precise specifications for the functionality and user experience of the Application that Domo would have otherwise struggled to recreate. Nomi further communicated its requirements via email. Based on information and belief, Domo's agents knew that Nomi's agents were located in this State.

56.     The upshot is clear: But for Domo's willingness to use the screen captures and recordings and email communications to copy the Application, Nomi could not have brought Project Tiger, in its current infringing form, to market. And Domo's agents knew that Domo, through its development activities, was causing and/or materially contributed to Nomi's

infringement. As explained, however, Domo did not just develop Project Tiger; Domo jointly hosted Project Tiger on Domo's servers.

**THIRD CLAIM: VIOLATION OF THE DEFEND TRADE SECRETS ACT (DTSA)**

***Nomi is liable for misappropriation under 18 U.S.C. § 1836.***

57.     OSGHD incorporates by reference prior paragraphs as though fully set forth herein.

58.     OSGHD owns trade secrets in the Application's Admin Component. The Admin Copyrights are code and everything that flows from the code. OSGHD's trade secrets extend beyond the Admin Copyrights, however. As explained, OSGHD licenses a basic (unmodified) software package from OnSite. The Admin Copyrights are derived from that forked software package. OSGHD owns both the modifications to the forked software package *and* the forked software itself. OSGHD thus owns all code, forked or modified, giving rise to the Application's Admin Component.

59.     The Application's Admin Component has independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable via proper means by, others who could obtain economic value from such information. Though the Application's Registration and Tablet Components are critical to the COVID-19 testing solution, the Admin Component is the overall enabler. That component allows scheduling, staffing, specifying of tests, and, for events closed to the public, importing of eligibility lists. The Admin Component also enables call-center users to look up patients and their results, to investigate problems, and to assist patients. The Admin Component also provides Nomi access to detailed information about all aspects of COVID-19 testing operations. OSGHD learned the necessary content and functionality of the Admin Component over time, and the Admin Component contributes to the Application's overall success.

60.     OSGHD takes reasonable measures to ensure the secrecy of the Admin Component. Nomi is the sole entity to which OSGHD made available the Admin Component, and the License Agreement contains strict confidentiality and nondisclosure obligations. Nomi, moreover, confirmed its understanding that the "Application and underlying software comprise confidential information and know-how that are the exclusive property of [OSGHD]." Nomi's confidentiality obligations survive the License Agreement's termination.

61.     Though the Application's Registration and Tablet Components are widely used, the Admin Component is not. Indeed, access to the Admin Component is granted to Nomi personnel on a need-to-know basis only. This group includes call-center staff, event-management staff, field-lead staff, and a few operations-management staff. Those persons' roles are operational, not programming, in nature. The users are granted only the access necessary to perform their respective jobs and are restricted access to other parts of the Admin Component.

62.     OSGHD granted access to the Admin Component to certain Nomi personnel. Because some Nomi personnel were trusted enough to have full permissions in the Application, those personnel could in turn grant access to other Nomi personnel. These persons with such "super permission" include Nomi's Jason Cook and Sonya Stauffer. OSGHD periodically reviewed existing users and their user roles and types, to ensure that access was proper. Upon conducting one such review, OSGHD learned that Mr. Cook and/or Ms. Stauffer abused OSGHD's trust and that they had granted access, or greater-than-necessary access, to users who should not have had access. These persons include Nomi's Ms. Buldo (Project Tiger's manager) and Mr. Shah (Vice President of Software Development, who was primarily charged with developing Project Tiger) and Agiliway's Andriy Khamuliak (a Project Tiger software engineer) and Vika Yaremchuk (a

Project Tiger lead engineer). Such persons, especially software developers and engineers, were granted access solely for the purpose of misappropriating OSGHD's trade secrets.

63.     Nomi first wrongfully acquired OSGHD's trade secrets by fraudulently inducing OSGHD to enter into the License Agreement and to continue performance under the License Agreement. [7] Nomi then wrongfully disclosed and/or used OSGHD's trade secrets by incorporating them into Project Tiger. Nomi's wrongful use is evidenced by at least three sources of evidence: side-by-side comparisons, design quirks, and software-development timelines.

64.     OSGHD never consented to Nomi using its trade secrets to create an alternative software application. On the contrary, the License Agreement explicitly prohibits such conduct.

65.     OSGHD's trade secrets relate to a product or service used in, and/or intended for use in, interstate or foreign commerce. OSGHD developed the Application for Nomi with the understanding that Nomi would conduct tests nationwide. Indeed, Nomi did so, using the Application to support COVID-19 testing in Alabama, California, Colorado, the District of Colombia, Florida, Hawaii, Iowa, Kentucky, Maryland, Missouri, Nebraska, Nevada, Puerto Rico, Texas, Utah, and Wisconsin.

### FOURTH CLAIM: FRAUDULENT INDUCEMENT

*Nomi is liable for fraudulent inducement.*

66.     OSGHD incorporates the prior paragraphs as though fully set forth herein.

67.     Nomi repeated several material misrepresentations in the course of negotiations with OSGHD. Consider first the formal misrepresentations in the 2021 License Agreement. In relevant part, Nomi made at least five material misrepresentations in the License Agreement

---

[7] OSGHD expressly incorporates into this claim OSGHD's fraudulent-inducement and string-a-long-fraud claims.

because it knew at the very time that it was signing the 2021 License Agreement that those representations were false.

68.     First, that Nomi would not attempt to "view, read, modify, reverse compile, reverse assemble, disassemble, or print the Application's source code or object code or other runtime objects or files distributed with the Application."

69.     Second, that Nomi would not "otherwise reverse engineer, modify, or copy the look and feel, functionality, or user interface of any portion of the Application" and that, to the extent Nomi did create its own functionalities, it would do so "without reference to or aid of access to the Application."

70.     Third, that Nomi would not "provide, or otherwise make available the Application, in any form, to any third party" and would not "share Online Account or Online Account Access Information with third parties."

71.     Fourth, that Nomi would not "use or disclose to any third party any Confidential Information of the other party for any reason, except to its employees, who require such knowledge in the ordinary course of their employment and are held to the same confidentiality obligations set forth in the Agreement."

72.     Fifth, that Nomi would take "all necessary action to ensure that its employees comply with the confidentiality provisions of Section 7."

73.     The above representations were not true at the time they were made on November 9, 2021 and OSGHD knew it—or at very best, it lacked knowledge of their truth.

74.     After the 2020 License Agreement expired by its terms on September 2, 2020, Mr. Gibson called Mr. Hartman to discuss the reason why Gibson believed a fee adjustment was in order. Mr. Hartman pushed back and refused to sign a new agreement for the next several months.

OSGHD nonetheless continued to perform its obligations under the License Agreement. It was during this time period that Mr. Hartman and Nomi reached their "breaking point" and decided to create the Tiger software platform to replace the OSGHD Application.

75.     The only problem in OSGHD's plan was timing. First, Nomi needed to buy time for Nomi to reverse engineer, modify, and copy the Application. Second, Nomi needed to ensure that Nomi had continued access to the Application for Nomi to be able to continue to operate because, without such access, Nomi would be unable to continue to provide COVID-19 testing. For both reasons, Nomi was acutely aware that Nomi needed continued access to the Application to implement its scheme and to stay in business.

76.     While OSGHD was continuing to perform in good faith in September and October 2021—notwithstanding the 2020 License Agreement had expired on September 2, 2021—Nomi understood that OSGHD was not willing to continue to operate without a License Agreement indefinitely. Hartman's solution: (1) deceive OSGHD into signing the 2021 License Agreement while OSGHD had no intention of honoring the representations to which it was committing Nomi; and (2) buy enough time for Nomi to use its access to the Application secretly to create Project Tiger by reverse engineering, modifying, and/or copying the Application.

77.     Notwithstanding that Nomi's leadership team reached its "breaking point" with OSGHD in Fall 2021 and decided that Nomi needed to seek a different software solution than the Application, none of Nomi's leadership disclosed this fact to OSGHD. This was an omission of a material fact that Nomi failed to disclose, which omission OSGHD relied upon in signing the 2021 License Agreement. Not only was this a material omission during the parties' discussions and negotiations in Fall 2021, it became a material misrepresentation upon the signing of the 2021 License Agreement on November 9, 2021. In particular, Nomi's representation that it would not

(nor allow others to) "reverse engineer, modify, or copy the look and feel, functionality, or use interface of any portion of the Application" was known by Nomi to be false at the time it was made recklessly, as a positive assertion, without knowledge of its truth.

78.     Nomi's fraudulent intent can also be inferred from Nomi's financial motive to defraud OSGHD. Nomi has acknowledged it decided to develop a replacement application before Nomi executed the 2021 License Agreement on November 9, 2021. Nomi has stated that "In response to OSGHD's threats to terminate the 2020 License Agreement and drastic increases in license fees, Nomi Health determined that it would develop its own software platform—the Tiger software platform—to replace the Application licensed from OSGHD." Nomi has further stated that it was "concerned that it could not obtain a replacement software platform in that timeframe, and could not risk shutting down during a national health crisis." According to Nomi, Nomi "felt it had no choice but to agree to OSGHD's exorbitant license fees in the 2021 License Agreement."

79.     Nomi thus concedes that, at the very time it signed the 2021 License Agreement, Nomi was dissatisfied with the contract's terms and was actively planning alternatives to OSGHD. Moreover, Nomi knew (i) that time was of the essence in creating an alternative software platform to replace the Application and (ii) it would be impossible to do so without reverse engineering, modifying, and/or copying the OSGHD Application. And that is exactly what Nomi did.

80.     Nomi intended that OSGHD rely or act on his misrepresentations and omissions. Had Nomi disclosed to OSGHD that Nomi was intending to develop its own replacement software—not to mention if Nomi had disclosed to OSGHD that Nomi intended to do so by reverse engineering, modifying, or copying the Application—OSGHD would have immediately ceased supporting the Application and would not have signed the 2021 License Agreement. But as Nomi

has acknowledged, Nomi could not afford such termination because it had no comparable software of its own and no third-party alternative providers.

81.     OSGHD relied on Nomi's misrepresentations and omissions. Had Nomi disclosed to OSGHD that Nomi intended to reverse engineer, modify, or copy the Application, or otherwise misappropriate it, OSGHD, at a minimum, would have immediately ceased allowing Nomi access to the Application. OSGHD's reliance was likewise reasonable because Nomi had given OSGHD no indication that Nomi intended to reverse engineer, modify, or copy the Application.

82.     OSGHD's reliance on Nomi's misrepresentations and omissions caused OSGHD to suffer substantial damages.

83.     First, Nomi was able to terminate the License Agreement early, about five months before the expiration of the one-year term, as a result of switching to Project Tiger. But for this switch, which was only possible as a result of Nomi reverse engineering, modifying, and/or copying the OSGHD Application, OSGHD would have continued to receive the fees under the 2021 License Agreement through the expiration of its one-year term in September 2022. Thus, OSGHD lost the fee-revenue that it would have received for the last five months that remained on the License Agreement, which amounts to many millions of dollars. Moreover, Nomi would have needed to renew the 2021 License Agreement (just as it needed to renew the 2020 License Agreement), and OSGHD has lost the benefit of those future fees as well, which likewise amounts to additional millions of dollars.

84.     Second, given that Nomi could not operate its business and generate the hundreds of millions of dollars that it earned from its COVID-19 testing business, OSGHD was in an extremely favorable bargaining position *vis a vis* Nomi. But for Nomi's misrepresentations and omissions, OSGHD would have been in a position to sign a license agreement on far more

favorable terms than the terms that OSGHD generously agreed to in the 2021 License Agreement. Alternatively, OSGHD could have been in a position to require Nomi to purchase the OSGHD Application in the event that Nomi wanted to continue to have access to OSGHD's Application that was essential to Nomi's continued operations. Regardless of the nature and terms of the business arrangement that may have been struck, one thing is certain: any business deal would have resulted in OSGHD receiving untold more millions of dollars than it actually received under the terms of the 2021 License Agreement.

85.     Nomi's representations were not just express but implied because OSGHD would never had effectively *sold* to Nomi the Application for the same price at which Nomi merely *licensed* the Application. (As Mr. Gibson advised Mr. Hartman, the Application would have sold for about $40 million.) Indeed, Nomi is liable for common-law fraud not just for Nomi's misrepresentations but for Nomi's successful employment of cunning, deception, or artifice to circumvent, cheat, or defraud OSGHD to its injury. Apart from its then-present intent to not perform, Nomi went to great lengths to conceal its scheme to reverse engineer, modify, or copy the Application, infringe the Copyrighted Work, and/or misappropriate the Admin Component to OSHGD's detriment. Nomi hid from OSGHD that Nomi had enlisted Domo and other developers to create Project Tiger and, indeed, had employed Confluence and Jira Stories to share OSGHD's Application with Domo and other developers.

## FIFTH CLAIM: STRING-ALONG FRAUD

86.     OSGHD incorporates by reference the prior paragraphs as though fully set forth herein.

87.     To give Nomi a generous benefit of the doubt that is contrary to the facts, one could assume that (i) Nomi knew nothing of Nomi's plans or considerations to develop a software

platform (that became Project Tiger) to replace the Application at the time Nomi signed the 2021 License Agreement on November 9, 2021 and (ii) shortly thereafter Nomi radically changed its mind and implemented plans for a replacement software application. Even if that were true, and Nomi did not fraudulently induce OSGHD to *execute* the License Agreement, Nomi fraudulently induced OSGHD to *continue its performance* under the License Agreement. As referenced above, Nomi decided to replace the application with Project Tiger by *Fall 2021*. But knowing this, Nomi never informed OSGHD of these plans and did not terminate the License Agreement until *April 2022*.

88.    OSGHD relied on the ongoing nature of the contractual representations in the License Agreement. OSGHD performed under the License Agreement by licensing the Application to Nomi and by providing attendant services. OSGHD could have terminated the License Agreement with thirty days' notice and/or threatened to terminate unless Nomi were to cease and desist from its secret efforts to create a replacement software platform—particularly, in doing so by reverse engineering, modifying, and/or copying the OSGHD Application. But Nomi continued to string along OSGHD into believing that nothing was amiss, no development efforts were taking place for Project Tiger, and that Nomi intended to continue to honor its contractual representations.

89.    The contractual representations discussed above were *ongoing* misrepresentations. Moreover, Nomi had a duty to disclose that the representations—even if true when made—became untrue with subsequent developments. First, Nomi signed a nondisclosure agreement with OSGHD, establishing a confidential relationship. Second, Nomi became aware that Nomi intended to breach its contractual representation sometime after signing the License Agreement (if not before signing). At the point Nomi first learned of this intent, it had an obligation to inform

OSGHD of the materially changed circumstances that rendered the ongoing contractual representations untrue.

90.     For the reasons explained above, Nomi intended that OSGHD rely or act on the misrepresentations—lest OSGHD terminate the License Agreement before Nomi could bring Project Tiger to market.

91.     OSGHD did rely upon Nomi's continuing, string-along fraud and suffered substantial monetary damages as a result.

92.     Nomi's business practices have been the subject of investigative reports including an expose by *USA Today* that have raised serious questions regarding Nomi's business ethics. For example, the *USA Today* article discusses how Nomi was able to profit off the pandemic through a network of political connections and "no-bid" contracts that resulted in taxpayers in four different states paying Nomi more than $200 million in return for questionable test results. As further reported, Nomi has leveraged the enormous revenues that it generated from its COVID-19 testing recently to raise an additional $110 million from venture capital firms and go on a buying spree in gobbling up three other health care companies. Nomi's fraud here aligns with Nomi's broader business practices.

## SIXTH CLAIM: TORTIOUS INTERFERENCE WITH CONTRACT

### *Domo is liable for tortious interference with contract.*

93.     OSGHD incorporates by reference the prior paragraphs as though fully set forth herein.

94.     Domo is not a party to the License Agreement, which is an existing contract between OSGHD and Nomi that is subject to interference.

95.     Domo has willfully and intentionally interfered with the License Agreement by developing Project Tiger with Nomi and by jointly hosting Project Tiger on servers. Domo consciously used the Application as a template for developing Project Tiger.

96.     Domo's development and joint-hosting proximately caused OSGHD's damage. Domo could reasonably foresee that, by developing Project Tiger and jointly hosting it on servers, Nomi would breach the restrictions and confidentiality obligations imposed by the License Agreement.

97.     OSGHD has suffered actual damage or loss.

## PRAYER FOR RELIEF

WHEREFORE, OSGHD respectfully requests that judgment be entered against Defendants as follows:

A.      That Nomi and Domo be required to account for all gains, profits, and advantages derived through their direct and contributory infringement of OSGHD's copyrights;

B.      That Nomi and Domo be required to account for all gains, profits, and advantages derived through their misappropriation of OSGHD's trade secrets;

C.      That Nomi and Domo be required to pay to OSGHD its actual damages, in addition to Nomi's profits attributable to its direct and contributory infringement of OSGHD's copyrights;

D.      That OSGHD be awarded pre-judgment and post-judgment interest;

E.      That Nomi and Domo be required to pay OSGHD the costs of this action;

F.      That Nomi and Domo be required to pay OSGHD its reasonable attorneys' fees;

G.      That OSGHD be awarded exemplary or punitive damages against Nomi; and

H.      That the Court grant such other and further relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

OSGHD hereby demands a trial by jury in this case on all issues so triable.

Date: March 17, 2023

Respectfully submitted,

**McKOOL SMITH, P.C.**

*/s/   Gary Cruciani*
Gary Cruciani
Texas Bar No. 05177300
gcruciani@mckoolsmith.com
Scott Hejny
Texas Bar No. 24038952
shejny@mckoolsmith.com
Patrick Pijls
Texas Bar No. 24118501
ppijls@mckoolsmith.com
J. Davis "Joshua" Jones
Texas Bar No. 24129700
jjones@mckoolsmith.com 300 Crescent
Court, Suite 1500
Dallas, Texas 75201
Telephone:  (214) 978-4000
Facsimile:  (214) 978-4044

***Counsel for OSGHD, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties through the Court's Electronic Case Filing System.

*/s/ Gary Cruciani*
Gary Cruciani